United States District Court
Southern District of Texas
FILED

NOV 26 2013

David J. Bradley, Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. |
| | : | VIOLATIONS:  13CR 737 |
| | : | |
| | : | 50 U.S.C. § 1705 |
| v. | : | (International Emergency Economic |
| | : | Powers Act) |
| WEATHERFORD INTERNATIONAL LTD. | : | |
| | : | 50 U.S.C. app. §§ 5 and 16 |
| | : | (Trading with the Enemy Act) |
| Defendant | : | |

## CRIMINAL INFORMATION

The United States Attorney charges that:

### GENERAL ALLEGATIONS

At all times material to this Information:

1. Defendant, Weatherford International Ltd. ("Weatherford"), was an oil and gas service company headquartered in Houston, Texas.

2. As part of its international market Weatherford supported the sales and operations of its subsidiaries in the countries of Iran, Cuba, Sudan and Syria. Principally, business in the countries of Iran, Sudan and Syria was conducted through a Weatherford subsidiary known as Weatherford Oil Tool Middle East, Ltd. ("WOTME"). Business in Cuba was conducted through a Weatherford subsidiary known as Precision Energy Services Colombia Ltd. ("PESC"), headquartered in Canada.

3. Weatherford specialized in providing products and services related to, *inter alia*, drilling and production of oil and natural gas wells for independent oil and natural gas producing companies around the world. It provided technologically advanced products and services

in a variety of oil and gas related areas, including drilling, evaluation, completion, production, and intervention cycles of oil and gas wells. Weatherford is currently headquartered in Geneva, Switzerland, but at the time of the conduct and transactions at issue was headquartered in Houston, Texas. Weatherford operated in more than 100 countries and employed more than 50,000 people worldwide.

4. Relevant to the conduct and transactions at issue, Weatherford and Weatherford subsidiaries engaged in conduct that violated United States export control and sanction laws by exporting or re-exporting items to, and conducting Weatherford business operations in, sanctioned countries, namely Cuba, Iran, Syria, and Sudan, without the required authorization from the United States government.

5. The Office of Foreign Assets Control ("OFAC"), which is located in the District of Columbia, administered and enforced, among other things, economic and trade sanctions against Cuba, Iran, and Sudan. OFAC acted under Presidential national emergency powers, as well as authority granted by specific legislation, to impose controls on certain transactions. OFAC was empowered to authorize transactions with these countries and entities through the granting of a license.

6. The Department of Commerce's Bureau of Industry and Security ("BIS"), which is located in the District of Columbia, administered and enforced, economic and trade sanctions against Syria. BIS acted under Presidential national emergency powers, as well as authority granted by specific legislation, to impose controls on certain transactions. BIS was empowered to authorize transactions with these countries and entities through the granting of a license.

7. At all times material to the Information, the Cuban Sanctions, Iranian Sanctions, Syrian Sanctions, and Sudanese Sanctions were in effect.

## The Cuban Sanctions

8. The United States has maintained an economic embargo against Cuba since 1963. The regulations enacted to implement this embargo restrict United States trade and economic transactions with Cuba. The Cuban Assets Control Regulations ("CACR"), 31 C.F.R. Part 515, which were promulgated under, among other authorities, the Trading With the Enemy Act of 1917, 50 U.S.C. app. §§ 1-44, were administered and enforced by the OFAC, and prohibited most financial and commercial dealings with Cuba, Cuban businesses, and Cuban assets by persons subject to the jurisdiction of the United States. The Export Administration Regulations ("EAR"), 15 C.F.R. Parts 730-774, administered and enforced by the BIS, were originally promulgated pursuant to the Export Administration Act of 1979, as amended, 50 U.S.C. App. 2401-2420, and were maintained in force under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1707, and Executive Order 13222 of August 17, 2001. The EAR prohibited virtually all exports of commodities, software or technology from the United States to Cuba and re-exports of United States origin items from third countries to Cuba.

9. Unless authorized by the OFAC, persons subject to the jurisdiction of the United States were prohibited from dealing in any property in which Cuba or a Cuban national has an interest. 31 C.F.R. § 515.201. The CACR defined "property" broadly to include, *inter alia*, money, debts, bills of lading, leaseholds, contracts, and services, and interests therein, whether present, future, or contingent. 31 C.F.R. § 515.311. Similarly, the

3

CACR defined "interest" broadly to include an interest of any nature whatsoever, direct or indirect. 31 C.F.R. § 515.312. The CACR also prohibited any "transaction for the purpose or which has the effect of evading or avoiding any of the prohibitions" described in this paragraph. 31 C.F.R. § 515.201. In addition to the OFAC Regulations discussed above, a Department of Commerce license is required to export or reexport all items subject to the EAR to Cuba, with certain limited exceptions. 15 C.F.R. § 746.2(a).

## International Emergency Economic Powers Act

10. The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1707, authorized the President of the United States to impose economic sanctions against a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy, or economy of the United States when the President declared a national emergency with respect to that threat.

## The Iranian Sanctions

11. In 1987, President Ronald W. Reagan issued Executive Order No. 12613, imposing a broad embargo on imports of Iranian-origin goods and services. United States sanctions against Iran were strengthened in 1995 and 1997, when President William J. Clinton issued Executive Order Nos. 12957, 12959, and 13059, pursuant to, *inter alia*, IEEPA. These Executive Orders as implemented by the Iranian Transaction Regulations ("ITR"), 31 C.F.R. part 560, as well as Part 746.7 of the EAR, prohibited virtually all trade and investment activities between the United States and Iran, including but not limited to broad prohibitions on: (a) the importation into the United States of goods or services from Iran; (b) the exportation, sale, or supply of goods, technology, or services from the United States or by a United States person to Iran; (c) trade-related transactions with Iran

4

by United States persons, including financing, facilitating, or guaranteeing such transactions; (d) the re-exportation from third countries to Iran by foreign persons of dual use and sensitive United States origin goods, technology, or services (including foreign manufactured products incorporating 10% or more controlled United States origin content); (e) investment by United States persons in Iran or in property owned or controlled by the Government of Iran; and (f) facilitation by United States persons of transactions by foreign persons if the transaction by the foreign person would be prohibited if it were a United States person.  Although the ITR authorized the exportation of goods or technology from the United States to a third country for substantial transformation or incorporation into a foreign-made end product intended specifically or predominantly for Iran where the United States-origin goods or technology were *de-minimis* and not controlled, this authorization specifically carved out foreign-made end products intended for use in the petroleum or petrochemical industries.

12. With the exception of certain exempt or authorized transactions, the OFAC regulations implementing the Iranian sanctions generally prohibited the export of goods, technology, or services to Iran from the United States.  The ITR also prohibited "[a]ny transactions by a United States person or within the United States that evades or avoids, has the purpose of evading or avoiding, or attempts to violate any of the prohibitions set forth in [these orders]."  Section 746.7(e) of the EAR prohibits the export or re-export of any item subject to the EAR if such transaction is prohibited by the ITR and not authorized by the OFAC. This prohibition applied whether or not the EAR required a license for the export or re-export.

## The Syrian Sanctions

13. President George W. Bush signed the Syria Accountability and Lebanese Sovereignty Restoration Act of 2003 ("SAA") in December 2003. On May 11, 2004, the President issued Executive Order No. 13338, blocking the property of certain persons and the export of certain goods to Syria. This Executive Order generally prohibited the export or re-export of United States goods to Syria, providing that, except for food and medicine, "the Secretary of Commerce shall not permit the exportation or re-exportation to Syria of any product of the United States" and that "[n]o other agency of the United States Government shall permit the exportation or re-exportation to Syria of any product of the United States . . . ." The corresponding General Order No. 2 to Part 736 of the EAR, issued by the BIS to implement the SAA Order, restricted exports and re-exports to Syria of all items subject to the EAR other than food and certain medicine.

## The Sudanese Sanctions

14. On November 3, 1997, President William J. Clinton issued Executive Order No. 13067, imposing a trade embargo against Sudan and blocking all property, and interests in property, of the Government of Sudan. President George W. Bush took additional steps with respect to the embargo in 2006, pursuant to Executive Order No. 13412. Under these Executive Orders, virtually all trade and investment activity between the United States and Sudan is prohibited, including but not limited to broad prohibitions on: (a) the importation into the United States of goods or services from Sudan; (b) the exportation or re-exportation of any goods, technology, or services from the United States or by a United States person to Sudan; and (c) certain brokering activities and financing provided to Sudan by United States persons, including financing, facilitating, or guaranteeing such

transactions. These Executive Orders further prohibited "[a]ny transactions by a United States person or within the United States that evades or avoids, has the purpose of evading or avoiding, or attempts to violate any of the prohibitions set forth in" the orders. With the exception of certain exempt or authorized transactions, the OFAC regulations implementing the Sudan sanctions generally prohibited the export of goods, technology, and services to Sudan from the United States.

## COUNT ONE
## INTERNATIONAL EMERGENCY ECONOMIC POWERS ACT
## (50 U.S.C. § 1705)

1. Paragraphs 1 through 14 of the General Allegations are re-alleged as if fully set forth herein.

2. From in or about 1998, and continuing until in or about January 2007, the exact dates being unknown to the United States, in the Southern District of Texas and elsewhere, the defendant, WEATHERFORD INTERNATIONAL LTD., did willfully violate and attempt to violate the International Emergency Economic Powers Act, by exporting, reexporting, selling, and supplying goods and services and by causing the export, reexport, sale, and supply of goods and services—without a license or authorization obtained from OFAC—from the United States to Iran and the Government of Iran, including goods and services relating to oil and gas drilling, in violation of Title 50, United States Code, Section 1705; Title 18, United States Code 52; and Title 31, Code of Federal Regulations Sections 560.204 and 560.203.

## COUNT TWO
## TRADING WITH THE ENEMY ACT
## (50 U.S.C. app. §§ 5 and 16)

1. Paragraphs 1 through 14 of the General Allegations are re-alleged as if fully set forth herein.

2.  From in or about August 2005, and continuing until in or about January 2007, the exact dates being unknown to the United States, in the Southern District of Texas and elsewhere, the defendant, WEATHERFORD INTERNATIONAL LTD., willfully and knowingly violated regulations promulgated under the Trading With the Enemy Act, Title 50, United States Code Appendix, Sections 5 and 16, specifically Title 31, Code of Federal Regulations Sections 515.201(b), 515.201(c), and 515.420, *to wit*, without having obtained a license, engaged in prohibited transactions in which Cuba and a Cuban national has an interest, and engaged in transactions for the purpose of and having the effect of avoiding the prohibitions set forth in Title 31, Code of Federal Regulations Sections 515.201(b), 515.201(c), and 515.420 (Title 50, United States Code Appendix, Sections 5 and 16; Title 18, United States Code Section 2).

KENNETH MAGIDSON
United States Attorney

By: *S Mark McIntyre*
S. MARK MCINTYRE
Assistant United States Attorney

Dated: November 26, 2013

8