# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **13CR  737** |
| v. | ) | |
| | ) | No. _____ |
| WEATHERFORD INTERNATIONAL LTD., | ) | |
| Defendant | ) | **DEFERRED PROSECUTION** |
| | ) | **AGREEMENT** |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

Defendant Weatherford International Ltd. ("Weatherford") is an oil and gas service company headquartered in Geneva, Switzerland.  Weatherford, by and through its attorney, Gibson, Dunn & Crutcher LLP, hereby enters into this Deferred Prosecution Agreement (the "Agreement") with the United States Attorney's Office for the Southern District of Texas ("this Office").

1.      **Charges:**  Weatherford agrees that it shall waive indictment and agrees to the filing of a two-count Criminal Information in the United States District Court for the Southern District of Texas, charging it with:  (1) willfully violating and attempting to violate the Trading With the Enemy Act, 50 U.S.C. App. 1-44; and (2) willfully violating and attempting to violate the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1706 ("the Relevant Trade law").

2.      **Acceptance of Responsibility:**  Weatherford admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the Information, and as set forth in the statement of facts attached hereto as

Exhibit A and incorporated herein by reference (the "Factual Statement"), and that the allegations described in the Information and the facts described in Exhibit A are true and accurate.  If this Office, pursuant to Paragraph 9 of this Agreement, initiates a prosecution that is deferred by this Agreement against Weatherford, Weatherford agrees that it will neither contest the admissibility of the Factual Statement, reports, or any other documents provided by Weatherford to the United States, nor contradict in any prosecution initiated pursuant to this Agreement, the facts contained within the Factual Statement.  Neither this Agreement nor the criminal Information is a final adjudication of the matters addressed in such documents.  Nothing in this Agreement shall be construed as an acknowledgment by Weatherford that the Agreement, including the Factual Statement, is admissible or may be used in any proceeding other than in a proceeding brought by this Office.

3.      **Penalty Amount**:  Weatherford agrees that it shall pay a criminal monetary penalty in the amount of $48,000,000.  Weatherford hereby acknowledges that at least $98,000,000 was involved in transactions described in the Factual Statement, and that such transactions by Weatherford, or its subsidiaries, violated 50 U.S.C. App. 1-44 and 50 U.S.C. §§ 1701-1706.  Weatherford agrees that it shall pay the monetary penalty to the United States Treasury within thirty (30) days from Court approval of this Agreement pursuant to payment instructions as directed by the United States in its sole discretion.  Weatherford releases any and all claims it may have to such funds.  There is a separate agreement between Weatherford (and certain Weatherford subsidiaries and affiliates), and the Department of Commerce regarding disposition of certain administrative claims, which is attached.  Weatherford has separately agreed with the Department of Commerce to settle its administrative liability with, among other

conditions, a $50,000,000 administrative civil penalty, which is set forth in the attached agreement and is payable to the Department of Commerce.

4.     **Court is Not Bound**:  Weatherford and this Office understand that the Agreement must be approved by the United States District Court for the Southern District of Texas, in accordance with 18 U.S.C. § 3161(h)(2).  If that Court declines to approve this Agreement for any reason, this Office and Weatherford are released from any obligation imposed upon them by this Agreement, this Agreement shall be null and void, and this Office shall not premise any prosecution of Weatherford upon any admissions or acknowledgements contained herein, including in the Factual Statement.

5.     **Deferral of Prosecution**:  In consideration of Weatherford's remedial actions to date and its willingness to:  (a) acknowledge responsibility for its actions; (b) voluntarily disclose some of its conduct; (c) voluntarily produce documents and reports which describe its conduct; (d) continue its cooperation with the United States as stated in Paragraph 6; (e) maintain its Office of Global Compliance at an appropriate level of staffing, consistent with the compliance presentation made to the government in November 2009, during the pendency of this Agreement; (f) fulfill all the terms and conditions contained in the administrative settlement agreements with the Department of Commerce and the Department of the Treasury's Office of Foreign Assets Control, both of which are attached hereto; and (g) settle any and all civil and criminal claims currently held by this Office for any act within the scope of the Factual Statement, this Office agrees as follows:

i.     This Office, on behalf of the United States, shall recommend to the Court, pursuant to 18 U.S.C. § 3161(h)(2), that prosecution of Weatherford on the Information filed pursuant to Paragraph 1 be deferred for a period of twenty-four (24) months, or less at the

discretion of this Office, from the date of the filing of the Information referred to in Paragraph 1. Weatherford shall consent to a motion, the contents to be agreed upon by the parties, to be filed by this Office with the Court promptly upon execution of this Agreement, pursuant to 18 U.S.C. § 3161(h)(2), in which this Office will present this Agreement to the Court and move for a continuance of all further criminal proceedings, including trial, for a period of twenty-four (24) months, for speedy trial exclusion of all time covered by such a continuance, and for approval by the Court of this deferred prosecution. Weatherford further agrees to waive, and does hereby expressly waive, any and all rights to a speedy trial pursuant to the Fifth and Sixth Amendments of the United States Constitution, 18 U.S.C. § 3161, Federal Rule of Criminal Procedure 48(b), and any applicable Local Rules of the United States District Court for the Southern District of Texas for the period that this Agreement is in effect; and

    ii.  This Office, on behalf of the United States, shall, if Weatherford is in full compliance with all of its obligations under this Agreement, within thirty (30) days of the expiration of the time period set forth above in Paragraph 5(i), or less at the discretion of the United States, seek dismissal with prejudice of the Information filed against Weatherford pursuant to Paragraph 1, and this Agreement shall expire and be of no further force or effect.

   6.  **Cooperation**: Weatherford shall continue to cooperate fully with this Office, the Department of Commerce, and the Office of Foreign Assets Control in any and all matters relating to potential violations of the Relevant Trade law, subject to applicable law and regulations. At the request of this Office, the Department of Commerce, or the Office of Foreign Assets Control, Weatherford shall also cooperate fully with other domestic or foreign law enforcement authorities and agencies in any investigation of Weatherford, its affiliates, or any of its present and former officers, directors, employees, agents, and consultants, or any other party,

in any and all matters relating to potential violations of the Relevant Trade law. Weatherford agrees that its cooperation shall include, but is not limited to, the following:

      a.     Weatherford shall truthfully disclose all factual information not protected by a valid claim of attorney-client privilege or work product doctrine with respect to its activities, those of its affiliates, and those of its present and former directors, officers, employees, agents, and consultants concerning all matters relating to potential violations of the Relevant Trade law about which Weatherford has any knowledge or about which this Office, the Department of Commerce, or the Office of Foreign Assets Control may inquire. This obligation of truthful disclosure includes the obligation of Weatherford to provide to this Office, the Department of Commerce, and the Office of Foreign Assets Control, upon request, any document, record or other tangible evidence relating to such potential violations of the Relevant Trade law, the Department of Commerce, or the Office of Foreign Assets Control may inquire of Weatherford.

      b.     Upon request of this Office, the Department of Commerce, or the Office of Foreign Assets Control, with respect to any issue relevant to its investigation of potential violations of the Relevant Trade law in connection with the operations of Weatherford, or any of its present or former subsidiaries or affiliates, Weatherford shall designate knowledgeable employees, agents, or attorneys to provide to this Office, the Department of Commerce, and the Office of Foreign Assets Control the information and materials described in Paragraph 6(a) above on behalf of Weatherford. It is further understood that Weatherford must at all times provide complete, truthful, and accurate information.

      c.     With respect to any issue relevant to investigation by this Office, the Department of Commerce, or the Office of Foreign Assets Control of potential violations of the

Relevant Trade law in connection with the operations of Weatherford or any of its present or former subsidiaries or affiliates, Weatherford shall ensure that this Office, the Department of Commerce, and the Office of Foreign Assets Control are given access to all current and, to the extent possible, former directors, officers, employees, agents, and consultants of Weatherford for interviews and testimony in the United States. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with federal law enforcement and regulatory authorities. Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of Weatherford, may have material information regarding the matters under investigation.

d.      With respect to any information, testimony, documents, records or other tangible evidence provided to this Office, the Department of Commerce, or the Office of Foreign Assets Control pursuant to this Agreement, Weatherford consents to any and all disclosures, subject to applicable law and regulations, to other governmental authorities, including United States authorities and those of a foreign government, of such materials as this Office, the Department of Commerce, or the Office of Foreign Assets Control, in its sole discretion, shall deem appropriate.

7.      **Government Commitments**: In return for the full and truthful cooperation of Weatherford and compliance with the terms and conditions of this Agreement, this Office agrees that it shall not seek to prosecute Weatherford, its corporate parents, subsidiaries, affiliates, successors, predecessors, and assigns (excluding PD Drilling Holdings Inc. and Weatherford Production Optimisation (U.K.) Ltd. f/k/a eProduction Solutions U.K. Ltd.) for any criminal conduct that occurred before the date of this Agreement, that (i) is in the scope of or related to

the attached Factual Statement , or (ii) Weatherford disclosed and documented to this Office

prior to the signing of this Agreement, unless in the sole reasonable discretion of this Office,

there is a willful and material breach of this Agreement.  In the event of a breach resulting in a

prosecution of Weatherford, this Office may use any information provided by or on behalf of

Weatherford to this Office or any investigative agency, whether prior to or subsequent to this

Agreement, and/or any leads derived from such information, including the attached Factual

Statement.  Nothing in this Agreement protects or immunizes in any way any current or former

employee or official of Weatherford, or any other individual, from investigation or prosecution

by this Office, the Department of the Treasury's Office of Foreign Assets Control, the

Department of Commerce, or any other federal, state, or local investigative agency or prosecutor.

8.      **Waiver of Rights**:  Weatherford expressly waives, for purposes of this

Agreement and any action resulting from a breach of this Agreement:

(a)      any challenges to the venue or jurisdiction of the United States District Court for

the Southern District of Texas; and

(b)      any right to be charged by an Indictment returned by a grand jury, and agrees to

be prosecuted on the Information filed in this matter or on a superseding Information arising

from the facts presented in the Factual Statement.

9.      **Breach of the Agreement**:  If this Office determines, in its sole discretion, that

Weatherford has willfully and materially breached the agreement by (a) committing any felony

under U.S. federal law subsequent to the signing of this Agreement, (b) at any time providing in

connection with this Agreement deliberately false, incomplete, or misleading information, (c)

failing to cooperate as set forth in Paragraph 6 of this Agreement, or (d) otherwise failing

specifically to perform or to fulfill completely each and every one of Weatherford's obligations

under the Agreement, Weatherford shall thereafter be subject to prosecution for any federal criminal violation of which this Office has knowledge, including the charges in the Information described in Paragraph 1, which may be pursued by this Office in the U.S. District Court for the Southern District of Texas or any other appropriate venue.  Before the initiation of any such prosecution, Weatherford shall have ten (10) calendar days to request further review by the Office of the Deputy Attorney General.  Any such prosecution may be premised on information provided by Weatherford.  Any such prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against Weatherford notwithstanding the expiration of the statute of limitations for a period of three (3) years and seven (7) days from the date of the filing of the Information.  Thus, by signing this Agreement, Weatherford agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for a period of three (3) years and seven (7) days from the date of the filing of the Information.

10.     In the event that this Office determines that Weatherford has breached this Agreement, this Office agrees to provide Weatherford with written notice of such breach prior to instituting any prosecution resulting from such breach.  Within thirty (30) days of receipt of such notice, Weatherford shall have the opportunity to respond to this Office in writing to explain the nature and circumstances of such breach, as well as the actions Weatherford has taken to address and remediate the situation, which explanation this Office shall consider in determining whether to institute a prosecution.

11.     In the event that this Office determines that Weatherford has breached this Agreement: (a) all statements made by or on behalf of Weatherford to this Office or to the Court, including the attached Factual Statement, and any testimony given by Weatherford before

a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by this Office against Weatherford; and (b) Weatherford shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that statements made by or on behalf of Weatherford prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director or employee, or any person acting on behalf of, or at the direction of, Weatherford will be imputed to Weatherford for the purpose of determining whether Weatherford has violated any provision of this Agreement shall be in the sole discretion of this Office.

12.     Weatherford acknowledges that this Office has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if Weatherford breaches this Agreement and this matter proceeds to judgment.  Weatherford further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

13.     **Requirement to Obey the Law**:  If this Office determines during the term of this Agreement that Weatherford has committed any felony under U.S. federal law after the execution of this Agreement, Weatherford shall, in the sole discretion of this Office, thereafter be subject to prosecution for any federal crimes of which this Office has knowledge, including but not limited to the conduct described in the Factual Statement.  The discovery by this Office of any purely historical criminal conduct that did not take place during the term of the Agreement will not constitute a breach of this provision.

14.     **Parties Bound by the Agreement**: This Agreement and all provisions set forth herein bind Weatherford and any of its corporate parents, subsidiaries, affiliates, successors, predecessors, and assigns.  It is further understood that this Agreement and all provisions set forth herein are binding on this Office, but specifically do not bind any other federal agencies, or any state or local authorities, although this Office will bring the cooperation of Weatherford and its compliance with its other obligations under this Agreement to the attention of federal, state, or local prosecuting offices or regulatory agencies, if requested by Weatherford or its attorneys.

15.     **Public Statements**: Weatherford expressly agrees that it shall not, through present or future attorneys, directors, agents, officers, employees, consultants, contractors, subcontractors, or representatives, including any person or entity controlled by any of them, make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by Weatherford set forth above or the facts described in the attached Factual Statement.  Any such contradictory statement shall, subject to the cure rights of Weatherford described below, constitute a material breach of this Agreement as governed by Paragraph 9 of this Agreement, and Weatherford would thereafter be subject to prosecution as set forth in Paragraphs 10 through 12 of this Agreement.  The decision of whether any public statement by any such person contradicting, excusing, or justifying a fact contained in the Factual Statement will be imputed to Weatherford for the purpose of determining whether Weatherford has breached this Agreement shall be in the sole and reasonable discretion of this Office.  Upon this Office's notification to Weatherford of a public statement by any such person that in whole or in part contradicts, excuses, or justifies a statement of fact contained in the Factual Statement, Weatherford may avoid breach of this Agreement by publicly repudiating such statement within five (5) business days after notification by this Office.  Weatherford shall be permitted to contest liability, raise defenses, assert

affirmative claims, and otherwise take legal positions in other proceedings relating to the matters set forth in the Factual Statement provided that such legal positions do not contradict, in whole or in part, any statement contained in the Factual Statement. This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of Weatherford in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of Weatherford.

16. **Sales or Mergers**: Weatherford agrees that if it sells, merges, or transfers all or substantially all of its business operations or assets as they exist as of the execution of this Agreement to a single purchaser or group of affiliated purchasers during the term of this Agreement, it shall include in any contract for sale, merger, or transfer a provision binding the purchaser/successor/transferee to the obligations described in this Agreement. Any such provision in a contract of sale, merger, or transfer shall not expand or impose additional obligations on Weatherford as they relate to Paragraph 6 of this Agreement.

17. **Conduct Covered by Agreement**: It is further understood that this Agreement does not relate to or cover any conduct by Weatherford other than for any act within the scope of the Factual Statement and this Agreement. The investigation of Weatherford, its present and former parents, affiliates, divisions, and subsidiaries, their predecessors, successors, and assigns, being conducted by the Fraud Section of the Criminal Division regarding possible violations of the Foreign Corrupt Practices Act and related offenses is specifically excluded from this Agreement.

18. **Public Filing**: Weatherford and this Office agree that, upon acceptance by the United States District Court for the Southern District of Texas, this Agreement (and its

attachments) and an Order deferring prosecution shall be publicly filed in the United States District Court for the Southern District of Texas.

19.     **Complete Agreement**: This Agreement sets forth all the terms of the Agreement between Weatherford and this Office. There are no promises, agreements, or conditions that have been entered into other than those expressly set forth in this Agreement, and none shall be entered into and/or be binding upon Weatherford or this Office unless signed by a representative of this Office, Weatherford's attorneys, and a duly authorized representative of Weatherford. This Agreement supersedes any prior promises, agreements, or conditions between Weatherford and this Office. Weatherford agrees that it has the full legal right, power, and authority to enter into and perform all of its obligations under this Agreement and it agrees to abide by all terms and obligations of this Agreement as described herein.

**20.     Acknowledgment**

I, the duly authorized representative of Weatherford hereby expressly acknowledge the following: (1) that I have read this entire Agreement as well as the other documents filed herewith in conjunction with this Agreement, including the Information and Factual Statement; (2) that I have had an opportunity to discuss this Agreement fully and freely with Weatherford's attorneys; (3) that Weatherford fully and completely understands each and every provision of this Agreement; (4) that Weatherford is fully satisfied with the advice and representation provided by its attorneys; (5) that I am authorized, on behalf of Weatherford, to enter this Agreement; and (6) that Weatherford enters this Agreement knowingly and voluntarily.

Weatherford International Ltd.

November 25, 2013
_____
DATE

_____

Alejandro Cestero
Vice President, Co-General Counsel, and Corporate
Secretary

*Counsel for Weatherford International Ltd.*

We, the undersigned, are attorneys representing Weatherford in this matter. In connection with such representation, we hereby expressly acknowledge the following: (1) we have reviewed and discussed this Agreement with our client; (2) we have explained fully each of the terms and conditions of this Agreement to our client; (3) we have answered fully each and every question asked of us by our client; and (4) we believe that our client fully and completely understands all of the Agreement's terms.

November 26, 2013
DATE

F. Joseph Warin
Michael J. Edney
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

14

***On Behalf of the Government***

KENNETH MAGIDSON
United States Attorney

By: _____
     S. Mark McIntyre
     Assistant U.S. Attorney

Dated: _November 26, 2013_

EXHIBIT A:  STATEMENT OF FACTS

## I.  Introduction

1. This Statement of Facts is made pursuant to and incorporated by reference into the Deferred Prosecution Agreement dated 11/25/2013 between the United States and Weatherford International Ltd. ("Weatherford" or "the Company").

2. Between the years 1998 and 2007, Weatherford and certain Weatherford subsidiaries engaged in conduct that violated various U.S. export control and sanctions laws by exporting or re-exporting numerous items to, and conducting Weatherford business operations in, certain sanctioned countries, namely Cuba, Iran, Sudan, and Syria, without the required U.S. Government authorization.  In addition to the involvement of employees of several Weatherford subsidiaries, some Weatherford executives, managers, or employees on multiple occasions participated in, directed, approved, and/or facilitated the transactions and the conduct of its various subsidiaries.

3. This conduct involved U.S. persons, at various levels of the management or employment structure, participating in conduct by certain Weatherford foreign subsidiaries, and the unlicensed export or re-export of U.S.-origin goods to Cuba, Iran, Sudan, and Syria. Weatherford's subsidiary Precision Energy Services Colombia Ltd. ("PESC"), headquartered in Canada, conducted business in the country of Cuba.  Weatherford's subsidiary Weatherford Oil Tools Middle East ("WOTME"), headquartered in the United Arab Emirates ("UAE"), conducted business in the countries of Iran, Sudan, and Syria. Weatherford's subsidiaries Precision Energy Services Ltd. ("PESL"), headquartered in Canada, and Weatherford Production Optimisation (U.K.) Ltd. f/k/a eProduction Solutions U.K., Ltd. ("eProd-U.K."), headquartered in the United Kingdom, conducted business in the country of Iran.

4. In January 2007, Weatherford learned that the Department of Commerce's Bureau of Industry and Security ("BIS") and the U.S. Attorney's Office for the Southern District of Texas ("USAO") were investigating a Weatherford subsidiary for suspected violations of U.S. export control laws when BIS, supported by the Federal Bureau of Investigation, Immigration and Customs Enforcement, and the Houston Police Department, executed search warrants on the Weatherford subsidiary – eProduction Solutions, Inc. ("eProd-U.S.") – for suspected violations of the U.S. embargo on Iran.

5. Subsequent to learning of the U.S. Government's investigation of potential sanctions and export control violations by Weatherford subsidiaries, Weatherford retained outside counsel and initiated its own investigation of the business practices of Weatherford and its subsidiaries regarding compliance with U.S. sanctions and export control laws. Weatherford's internal investigation was eventually led by an international law firm, which reported to the Company's Audit Committee.

## II.   Weatherford's Business Organization

6.  Weatherford, a public company founded in 1972, is one of the world's largest oilfield services companies, with annual revenue totaling approximately $13 Billion for the year ended December 31, 2011. The Company's total revenue in calendar year 2010 was $10.2 Billion, and in 2009 amounted to $8.8 Billion. As of September 2012, Weatherford's reported market capitalization stood at $10.4 Billion.

7.  Weatherford specializes in providing products and services related to, *inter alia*, drilling and production of oil and natural gas wells for independent oil and natural gas producing companies around the world. It provides technologically advanced products and services in a variety of oil and gas related areas, including drilling, evaluation, completion, production, and intervention cycles of oil and gas wells. Weatherford is currently headquartered in Geneva, Switzerland, but at the time of the conduct and transactions at issue was headquartered in Houston, Texas. Weatherford operates in more than 100 countries and employs more than 50,000 people worldwide.

8.  At the time of the conduct and transactions at issue, Weatherford subsidiaries conducted sales and/or operations in the countries of Cuba, Iran, Sudan, and Syria. In September 2007, Weatherford decided to cease its subsidiaries' business in Cuba, Iran, Sudan, and Syria, and began to unwind existing business operations in those countries, a process which the Company substantially had completed by March 31, 2008. The Company's remaining withdrawal activities are being concluded only pursuant to licenses issued by OFAC.

## III.   Applicable Law

9.  At all times relevant to this matter, various U.S. sanctions and export control laws regulated the involvement of U.S. persons, U.S.-based conduct, and U.S.-origin commodities in business transactions with Cuba, Iran, and Sudan. The U.S. sanctions and export control laws regulating business transactions related to Syria came into effect in 2004.

### *Cuba Sanctions*

10. The United States has maintained an economic embargo against Cuba since 1963. The regulations enacted to implement this embargo restrict U.S. trade and economic transactions with Cuba. The Cuban Assets Control Regulations ("CACR"), which were promulgated under, among other authorities, the Trading With the Enemy Act of 1917, 50 U.S.C. app. §§ 1-44, are administered and enforced by the Office of Foreign Assets Control ("OFAC"), and prohibit most financial and commercial dealings with Cuba, Cuban businesses, and Cuban assets by persons subject to the jurisdiction of the United States. The Export Administration Regulations (15 C.F.R. Parts 730-774) ("EAR"), administered and enforced by BIS, were originally promulgated pursuant to the Export Administration Act of 1979, as amended, 50 U.S.C. App. 2401-2420, and are maintained in force under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1707, and Executive Order 13222 of August 17, 2001. The EAR prohibit

virtually all exports of commodities, software or technology from the United States to Cuba and re-exports of U.S.-origin items from third countries to Cuba.

11. Unless such dealings are authorized by OFAC or exempt from the prohibitions, persons subject to the jurisdiction of the United States are prohibited from dealing in any property in which Cuba or a Cuban national has an interest. 31 C.F.R. § 515.201. The CACR define "property" broadly to include, *inter alia*, money, debts, bills of lading, leaseholds, contracts, and services, and interests therein, whether present, future, or contingent. 31 C.F.R. § 515.311.

Similarly, the CACR define "interest" broadly to include an interest of any nature whatsoever, direct or indirect. 31 C.F.R. § 515.312. The CACR also prohibit any "transaction for the purpose or which has the effect of evading or avoiding any of the prohibitions" described in this paragraph. 31 C.F.R. § 515.201(c).

In addition to the OFAC regulations discussed above, a Department of Commerce license is required to export or reexport all items subject to the EAR to Cuba, with certain limited exceptions. 15 C.F.R. § 746.2(a). Also controlled are exports from third countries to Cuba of foreign-manufactured products incorporating more than 10% controlled U.S.-origin content. 15 C.F.R. § 734.4.

These laws and regulations were in effect at all times relevant to this Statement of Facts.

***Iran Sanctions***

12. In 1987, President Ronald W. Reagan issued Executive Order No. 12613, imposing a broad embargo on imports of Iranian-origin goods and services. U.S. sanctions against Iran were strengthened in 1995 and 1997, when President William J. Clinton issued Executive Order Nos. 12957, 12959, and 13059, pursuant to, *inter alia*, IEEPA. These Executive Orders as implemented by the Iranian Transactions Regulations ("ITR"), 31 C.F.R. part 560, as well as Part 746.7 of the EAR, prohibit virtually all trade and investment activities between the United States and Iran, including but not limited to broad prohibitions on: (a) the importation into the United States of goods or services from Iran; (b) the exportation, sale, or supply of goods, technology, or services from the United States or by a U.S. person to Iran; (c) trade-related transactions with Iran by U.S. persons, including financing, facilitating, or guaranteeing such transactions; (d) the re-exportation from third countries to Iran by foreign persons of dual use and sensitive U.S.-origin goods, technology, or services (including foreign manufactured products incorporating 10% or more controlled U.S.-origin content); (e) investment by U.S. persons in Iran or in property owned or controlled by the Government of Iran; and (f) facilitation by U.S. persons of transactions by foreign persons if the transaction by the foreign person would be prohibited if it were a U.S. person. Although the ITR authorize the exportation of goods or technology from the United States to a third country for substantial transformation or incorporation into a foreign-made end product intended specifically or predominantly for Iran where the U.S.-origin goods or technology are de-minimis and not controlled, this authorization specifically carves out foreign-made end products intended for use in the petroleum or petrochemical industries.

With the exception of certain exempt or authorized transactions, OFAC regulations implementing the Iranian sanctions generally prohibit the export of goods, technology, or services to Iran from the United States.  The ITR also prohibit "[a]ny transaction by a United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate any of the prohibitions contained in this part."  Section 746.7(e) of the EAR prohibits the export or re-export of any item subject to the EAR if such transaction is prohibited by the ITR and not authorized by OFAC.  This prohibition applies whether or not the EAR requires a license for the export or re-export.

These laws and regulations were in effect at all times relevant to this Statement of Facts.

*Sudan Sanctions*

13. On November 3, 1997, President William J. Clinton issued Executive Order No. 13067, imposing a trade embargo against Sudan and blocking all property, and interests in property, of the Government of Sudan.  President George W. Bush took additional steps with respect to the embargo in 2006, pursuant to Executive Order No. 13412.  Under these Executive orders, most trade and investment activity between the United States and Sudan is prohibited, including but not limited to broad prohibitions on:  (a) the importation into the United States of goods or services from Sudan; (b) the exportation or re-exportation of any goods, technology, or services from the United States or by a U.S. person to Sudan; and (c) certain brokering activities and financing provided to Sudan by U.S. persons, including financing, facilitating, or guaranteeing such transactions.  These Executive orders further prohibit "[a]ny transactions by a United States person or within the United States that evades or avoids, has the purpose of evading or avoiding, or attempts to violate any of the prohibitions set forth in" the orders.  With the exception of certain exempt or authorized transactions, OFAC regulations implementing the Sudan sanctions generally prohibit the export of goods, technology, or services to Sudan from the United States.  The Sudan sanctions were in effect at all times relevant to this Statement of Facts.

*Syria Sanctions*

14. President George W. Bush signed the Syria Accountability and Lebanese Sovereignty Restoration Act of 2003 ("SAA") in December 2003.  On May 11, 2004, the President issued Executive Order No. 13338, blocking the property of certain persons and prohibiting the export of certain goods to Syria.  This Executive order generally prohibits the export or re-export of U.S.-origin goods to Syria, providing that, except for food and medicine, "the Secretary of Commerce shall not permit the exportation or re-exportation to Syria of any product of the United States" and that "[n]o other agency of the United States Government shall permit the exportation or re-exportation to Syria of any product of the United States . . . ."  The corresponding General Order No. 2 to Part 736 of the EAR, issued by the BIS to implement the SAA Order, restricts exports and re-exports to Syria of all items subject to the EAR other than food and certain medicine.  These prohibitions were in effect at all times relevant to this Statement of Facts, which does not address Weatherford business in Syria prior to 2004.

## IV.   Description of Relevant Conduct

*Cuba*

15. On August 31, 2005, subsidiaries of Weatherford paid approximately $2.28 Billion in cash and stock to acquire the "Energy Services" division and "International Contract Drilling" division of Precision Drilling Corporation ("PDC"), a company headquartered in and incorporated under the laws of Canada.  At the time they were purchased, the two divisions employed approximately 5,300 people in 25 countries, and PESL and its predecessors had been conducting business in Cuba for approximately 10 years.  The Weatherford entity that acquired PESL was Weatherford PES/PDG Limited ("WPES").  Business support services for PESL were located in Canada, and the Cuba business accounted for approximately 20 employees.  On September 1, 2005, WPES was acquired by Weatherford Global Products Ltd., a Cyprus entity, and on the same date, under Canadian law, amalgamated into a "new" PESL.  In December 2005, PricewaterhouseCoopers determined that PESL's Cuban-related business held a fair market value of approximately $8.1 Million.

16. Following the acquisitions from PDC, Weatherford executives and employees in Houston and at Weatherford Canada Partnership ("WCP"), a Canadian subsidiary of Weatherford, decided to transfer the Cuba operations within the Weatherford group of companies.

17. In late December 2005, three months after its purchase, PESL executed the transfer of its Cuba business to an existing PESL subsidiary, PESC.  PESC conducted business in Colombia.  The Cuba operations transferred to PESC were led by persons located in Canada, including one person who rotated between Canada and Cuba.

18. Prior to the initial acquisition in August 2005, a senior executive of the Weatherford parent company retained and consulted with outside export compliance counsel regarding PESL's Cuba operations and business interests.  Certain Weatherford executives and employees who had involvement with PESL or Cuba were provided with instructions regarding the U.S. embargo of Cuba.  The instructions specifically addressed prohibitions on exports to, and business relationships with, Cuba by persons subject to the jurisdiction of the United States, including prohibitions on the export and re-export of U.S.-origin goods and technology, or of services, to Cuba.

19. Prior to Weatherford's August 2005 acquisition, the Energy Services Division of PDC ("PDC/PESL") provided drilling services in Cuba under contracts with three entities (Peberco, Sherritt, and Cupet).  PDC/PESL's Canadian employees obtained equipment and parts as needed to support the Cuba business, and shipped goods directly from Canada to Cuba.  When these shipments involved U.S. content, PDC/PESL obtained a permit from the Canadian government prior to shipment.  From the acquisition in August 2005 until the transfer of the Cuban business to PESC in December 2005, PESL operated the Cuban business in the same manner as it had prior to Weatherford's purchase, and PESL was considered part of Weatherford's Canada operations.  Furthermore, Weatherford subsidiaries continued the performance of drilling services in Cuba under the existing contract with Sherritt, as well as under a new contract with Cupet, including

supporting or participating in the export or reexport of U.S. origin items to Cuba without U.S. Government authorization.

20. On several occasions beginning in January 2006, Weatherford executives and managers within the United States made decisions relating to Weatherford's business in Cuba. For example, on one occasion a product line manager located in the United States consulted on a technical and logistical matter pertaining to operations in Cuba.

21. After the August 2005 acquisition, Weatherford executives, managers, and employees in Houston and/or at WCP were involved with or supported the Cuba business by: providing Houston Human Resources Division support and services to PESC employees in Cuba, such as payroll, benefits, and health insurance; authorizing expenditures over $250,000 for "directional drilling" equipment; approving expenditures by PESC personnel involved in Cuba business or for Cuba-related operations; approving bonuses for PESC personnel involved in Cuba business; routing an inquiry about Cuba equipment upgrades; participating in sending U.S.-origin parts to Cuba, through Canada; receiving asset requests from Cuba and assisting in locating materials for Cuban operations with knowledge of their ultimate destination; sending "backfill" orders to Canada to replace shipments to Cuba; responding to requests for materials for Cuba; offering tools no longer needed in the United States to the Cuba operations; and, adding the code word "Barcelona" to Weatherford's computer equipment database in Houston so that employees could input Cuba equipment information into that database without expressly labeling it as Cuba. Several U.S. and Canadian employees involved with the Cuba operations understood "Barcelona" to mean "Cuba."

22. Prior to the Weatherford acquisition, PDC/PESL personnel referred to Cuba as "the Caribbean," and this reference to Cuba continued after the purchase. Following a May 2006 meeting including PESC managers, Cuba was frequently referred to as "Barcelona, Venezuela." At or about that time, employees of WCP and employees of PESC, both persons subject to the jurisdiction of the United States under the CACR, implemented a purchase and shipping documentation procedure that used "Barcelona, Venezuela" to mean "Cuba."

23. A functional location for Barcelona, Venezuela had been created in Weatherford's computer system in Houston, which reflected that items were located in Venezuela when in fact the items were actually located in Cuba. Weatherford documents, such as request forms and invoices, falsely reflected an ultimate destination in Barcelona, Venezuela instead of the actual ultimate destination of Cuba.

24. Falsely listing "Barcelona" for Cuba on shipping documents and within Weatherford's asset tracking system allowed Weatherford to differentiate Cuba transactions from actual Venezuela-related transactions. The use of the codeword also masked references to Cuba in a computer shipping system on which numerous Weatherford employees would have otherwise had visibility with respect to Cuba.

25. Prior to Weatherford's August 2005 acquisition, PDC/PESL exported and re-exported U.S.-origin goods, technology, and services to Cuba from or through Canada without the

required U.S. Government authorization. This continued post-acquisition until May 2006 when some employees and managers implemented the following practice for sending goods to and supporting the Cuba business: A PESC employee, located in Cuba, would prepare a request for goods and services and submit it to a subsidiary in Venezuela. The Venezuela subsidiary, in turn, would forward the request to WCP in Canada. Thus, the Cuban-origin request would falsely state that the subsidiary in Venezuela was requesting the goods and services. These requests instructed that the goods be shipped to "Barcelona, Venezuela" using a specific Canadian shipping company not affiliated with Weatherford. When WCP received the requests specifying delivery to Barcelona, Venezuela, certain employees at WCP knew the items were ultimately destined for Cuba and would refer the order to a specific PESC employee. At the same time, WCP would fill the order and forward the goods to the specified Canadian shipping company. When the Canadian shipping company received the goods, the Canadian PESC employee would then arrange for the goods to be exported to Cuba without the required U.S. Government authorization.

26. Orders shipped by PESC to Cuba contained goods of U.S.-origin and subject to the U.S. embargo of Cuba. These goods were exported by the PESC employee to Cuba as outlined above in violation of U.S. Export Control laws. In these instances documents would falsely reflect that the ultimate destination for these goods was Venezuela. No U.S. Government authorization was obtained for any of these transactions.

27. The revenue generated from operations involving Cuba, from 2005 through 2008, amounted to $36,932,807. No revenues were generated involving Cuba in 2009 or 2010.

### *Iran*

28. The business activities of Weatherford companies relating to Iran can be categorized into five areas of conduct: (A) the involvement of U.S. persons and the unlicensed export of goods, technology, and services from the United States to Iran for Underbalanced Drilling ("UBD") operations by WOTME; (B) the involvement of U.S. persons and the unlicensed export of goods and/or technology from the United States to Iran related to eProd-U.K.; (C) the sales of goods and services in Iran through a former Weatherford entity called Energy Ventures Mid East, Inc. ("EVMEI") and involving U.S. persons; (D) the involvement of U.S. persons in the acquisition of companies that had, and continued to engage in, business operations in Iran; and (E) the export of goods, technology, or services to Iran, Sudan, and Syria by WOTME for Weatherford's Iran-related "liner hanger" business.

    (A)    UBD Transactions in Iran

29. Among its many services, Weatherford offers specialized technology and services related to what the oilfield services industry refers to as "directional" and "underbalanced" drilling systems – a means of drilling for hard-to-reach oil reserves. Contrary to conventional oil drilling techniques, Weatherford utilizes its UBD process for drilling oil and gas wells where the pressure in the well is kept lower than the fluid pressure in the formation being drilled. Weatherford advertises that its UBD process can "reduce

formation damage, discover bypassed payzones, and increase reserves, ultimately increasing your asset's net present value."

30. WOTME is a Weatherford subsidiary based in Dubai, UAE, with operations in the Middle East and North Africa region. WOTME, which was incorporated in the British Virgin Islands, conducted certain business activities in Iran.

31. In March 2002, a U.S. person was appointed as the General Manager of Underbalanced Systems ("UBS") at WOTME. In that role, the General Manager worked closely with, and supervised, a team of engineers and managers for UBD systems. This General Manager reported to various Regional or Product Line Vice Presidents based in the Houston headquarters. On January 1, 2003, the General Manager assumed the title of UBS Product Line & Business Manager for WOTME.

32. Some employees and managers at Weatherford's Houston headquarters worked with the WOTME UBS Product Line & Business Manager to willfully export and supply goods and services (including from the United States) to end users in Iran, including the Government of Iran, without the required U.S. Government authorization. Some of these individuals were involved in decisions regarding WOTME's operations in Iran, including its business with the National Iranian Oil Company ("NIOC") and its subsidiary, the National Iranian Drilling Company ("NIDC"). NIOC and NIDC are both owned and controlled by the Government of Iran.

33. Certain U.S. persons employed by Weatherford in the United States and abroad played instrumental roles in executing the Iran UBD contract and organizing Weatherford resources to fulfill those contracts. These U.S.-person employees knew that it was against U.S. law to be involved in exports in support of Weatherford's business in Iran. A Weatherford manager actively coordinated activities in the company to ensure completion of the UBD project in Iran, regardless of U.S. prohibitions. This manager was aware that he could not be involved in this business and took steps to conceal his involvement by using code words to refer to Iran in written correspondence. Others at Weatherford gave advice and directions concerning execution of the project, including occasionally directing the activities of non-U.S. person employees involved in the contract.

34. Late in 2002, WOTME assessed the soil of certain oil fields in Iran to determine whether drilling could be accomplished by using Weatherford's state-of-the-art UBD technology and equipment. WOTME and NIDC had been engaged in discussions about potential UBD services from as early as 1999 until August of 2003.

35. On August 8, 2003, WOTME agreed to provide UBD equipment to the NIDC and to provide associated technical and operational support. The contract required the price of equipment to be paid up front and the price of services to be paid in installments over two years. The contract also included an extended ten year spare parts provision. During the execution of this contract, WOTME and Weatherford were involved in the export of certain items from the United States to Iran without the required U.S. Government authorization.

36. On August 28, 2003, WOTME entered into a written contract to provide oil services and equipment to Iran, in return for payments from the NIDC totaling approximately $15.3 Million. At the same time, a WOTME manager created a document binder labeled "Texas," in which he placed copies of project schedules, cost estimates, important emails, and communications with senior Weatherford management related to the UBD project in Iran. Between August 2003 and August 2004, WOTME engaged in equipment procurement for the project. WOTME employees and managers provided training to NIDC personnel in October 2004. On November 11, 2004, WOTME secured a $15.3 Million letter of credit from Bank Melli and NIDC for purposes of the UBD project. The contract expired on December 31, 2006.

37. WOTME's UBS Product Line & Business Manager maintained an "Iran Project Summary," among other documents related to the Iran UBD project, on his computer. This WOTME manager frequently discussed contract terms and the project's letter of credit with WOTME personnel who were negotiating the Iran contract, assigned Iran team responsibilities and action items immediately following the execution of the UBD NIDC contract, directed procurement efforts, including acquiring U.S.-origin items, approved project expenditures, communicated with UBD project staff and NIDC officials about the project, and sought support from U.S. personnel in Weatherford's Houston headquarters.

38. WOTME's UBS Product Line & Business Manager and U.S. persons within Weatherford who were involved in the UBD project were well aware of the prohibitions on business activities with Iran. For example, WOTME's UBS Product Line & Business Manager received copies of Weatherford's sanctioned country policies in 2002 and on other occasions, and he forwarded the policy documents to at least one other WOTME employee, specifically referencing the sanctioned country policies. In early 2003, he forwarded an email that was previously forwarded to him, which advised that American citizens and green card holders could not be involved with embargoed countries; and, in an early 2003 meeting that he attended, green card holders were told they were not required or expected to advise or comment on sanctioned country matters.

39. From about May 2001 through April 2007, WOTME's UBS Product Line & Business Manager and others at Weatherford and WOTME, including U.S. persons involved with the UBD project, took various steps to disguise Weatherford's operations in Iran, including using code words to refer to Iran in emails and correspondence, including phrases such as: "Off-shore Dubai," "OME" [other middle east], "OTHER MENA COUNTRY," "Dubai across the waters," and/or "delivery country." The UBS Product Line & Business Manager and others labeled files involving Iran as "The Texas Files," and requested that their names be removed from correspondence that discussed Iran. On occasion, Weatherford employees were instructed to ensure that items exported from the United States for the UBD Iran project did not show a U.S.-origin.

40. WOTME personnel also frequently used equipment ordered from the United States and exported these goods through WOTME's Dubai Office to Iran. WOTME personnel also received technical support and other services related to the contract for that equipment from persons located in the United States. No U.S. Government authorization was

obtained for any of these exports of goods and services from the United States to Iran. Without essential equipment and items sourced from the United States, as well as associated repairs or technical support by U.S. persons, Weatherford's UBD project in Iran could not have been completed.

41. From 2004 through 2006, according to a third-party analysis, sales related to Weatherford's UBD services and product sales in Iran amounted to $15,979,573 in revenue. No revenues were generated from UBD services or product sales in Iran in 2009 or 2010.

   (B)   eProd-U.K. Transactions in Iran

42. In 2001, Weatherford acquired the assets of CAC, Inc. and its affiliates, which became the center of the eProduction Solutions, Inc. ("eProd"), family of companies. eProd-U.S. and eProd-U.K. are subsidiaries of Weatherford considered to be world leaders in ensuring production optimization for flowing wells and all forms of artificial lift. eProd-U S. is incorporated in Texas and headquartered in Kingwood, Texas. eProd-U.K. is incorporated in Scotland and headquartered in Great Yarmouth, U.K. Both entities had a compliance policy that included guidance to employees concerning the U.S. embargo of Iran. eProd-U.K. managers and employees, with knowledge of Iran sanctions, specifically ordered U.S.-origin goods, including 180 items named "SDA pilots," from eProd-U.S. for incorporation into 90 control panels sold to Kala Naft in 2005 for use in the petroleum or petrochemical industries. Some eProd-U.S. employees and managers knew that the pilots were not being manufactured for inventory, but rather that they were a custom order and that the end-user was an entity named "Kala."

43. eProd-U.S. was not fully integrated into Weatherford, but the company's management was aware of Weatherford's ownership. After the Weatherford acquisition, eProd-U.K. continued to accept and pursue control panel sales and parts sales to Iran, as it had for several years prior to the acquisition. For example, eProd-U.K. sold a very large batch of control panels to Kala Naft, an Iranian entity, in 2005, and made several parts sales to Kala Naft between 2001 and 2007. Kala Naft procured goods for NIOC. eProd-U.K. occasionally solicited other Iranian-based business. eProd-U.K. relied on eProd-U.S. as a source for some parts.

44. An eProd-U.S. executive and U.S. citizen, who exercised oversight of the U.K. affiliate, was sent in May 2002 to the United Kingdom to remedy business performance issues. An operations manager of eProd-U.K. disclosed to the eProd-U.S. vice president that eProd-U.K. conducted business with Iran, and advised the eProd-U.S. vice president that he could not be involved.

45. eProd-U.K. conducted business with NIOC, a government owned corporation under the direction of the Ministry of Petroleum of Iran. In conjunction with its sales of equipment and services to NIOC, eProd-U.K. at times ordered items subject to the EAR from eProd-U.S.'s facilities located in the United States, while intending to use those items in Iran. eProd-U.K. employees who were U.S. persons were not directly involved with the sales to Iran. eProd-U.K. sales and intra-company orders were maintained and conducted

through a company database. When ordering and sourcing products and services for Iran from the United States, eProd-U.K. employees provided false information concerning the ultimate destination of the products ordered from eProd-U.S. In addition, eProd-U.K. employees removed labels and references to the U.S.-origin of products before exporting them to Iran.

46. In December 2004, Kala Naft confirmed order for 90 U.K.-manufactured control panel units, and on January 18, 2005, eProd-U.S. sent an intra-company quote to eProd-U.K. for 180 "SDA pilots" that would be incorporated into the 90 control panels that Kala Naft ordered. When eProd-U.K. employees ordered the SDA pilots from eProd-U.S., they identified a false country of ultimate destination.

47. In April 2005, eProd-U.K. held an initial production meeting related to the 90 control panels, and simultaneously ordered parts from eProd-U.S.'s Kingwood facility, including the 180 SDA pilots. eProd-U.S. is eProd-U.K.'s only supplier of the SDA pilots. eProd-U.S. employees understood that the pilots were meant for a specific project, because eProd-U.K. did not maintain a pilot inventory. eProd-U.S. did not request end-user statements because their practice at the time was not to do so for intra-company orders.

48. On occasion, eProd-U S. production meetings discussed Iran as the end-user for the pilot order, and on at least one occasion, documents at a production meeting showed Iran as the end-user. On another occasion, after eProd-U.S. had shipped the pilot order to eProd-U.K., a U.S. employee noted a production meeting that discussed an order bound for Iran.

49. On at least six occasions, internal emails used the code word phrase "Idaho" in communicating about Iran-related business. For example, a February 2005 intra-company e-mail between eProd managers referred to eProd-U.K.'s receipt of an order for "panels for Idaho." A November 2005 email from an eProd-U.S. executive referred to his work on the "bank guarantee for Idaho." A separate November 2005 email chain between and among eProd-U.S. and eProd-U.K. employees details an internal debate over accounting for revenue on orders shipped to the Middle East from eProd-U.K. The discussion used "Idaho" to mean Iran in discussing how the local shipping address determines revenue credit; a response used a second reference to "Idaho" in continuing a discussion about accounting for revenue on eProd-U.K.'s orders shipped to Iran.

50. In early 2006, eProd-U.K. returned several of these pilots to eProd-U.S. for repair after they had been damaged in the United Kingdom. When eProd-U.S. received the damaged pilots, the equipment labels – identifying their U.S. origin and Texas address – had been defaced to remove the company name and address. During the repairs on the SDA pilots, an eProd-U.S. employee conducted research through the company database and found that the SDA pilots were incorporated into control panels in the United Kingdom for an Iranian contract. After the employee questioned management about whether eProd-U.S. could repair the pilots and send them back to eProd-U.K. for ultimate shipment to Iran, the pilots were repaired, repacked, and eProd-U.S. allowed them to be returned to eProd-U.K. eProd-U.K. used the repaired pilots in the 90 panel order.

51. In addition to the transactions described above, eProd-U.K., on approximately twelve occasions, also ordered spare parts from the United States, items subject to the EAR, specifically to fulfill Iranian contracts. The end user for these spare parts sales was listed in eProd-U.K.'s records as "Kala Naft Co." or "Kala Ltd." Some of these transactions involved U.S.-origin parts from eProd-U.S., and others included U.S.-origin parts that were purchased by eProd-U.K. from other U.S. or U.K. companies outside of Weatherford. The items were ultimately transshipped from the United States to Iran via the United Kingdom, without the required U.S. Government authorization. The approximate gross revenue (*i.e.*, based on the amount paid by Kala Naft to eProd-U.K.) for all spare parts sales to Iran that included U.S. content was $2.7 Million. The approximate gross revenue from U.S.-origin parts attributed to these sales was $770,000.

52. The revenue generated from eProd-U.K. sales to Iran, from 2001 through 2008, amounted to $7,049,264. No revenues were generated from eProd-U.K. sales to Iran 2009 or 2010.

   (C)    Sales to Iran via EVMEI

53. In 1998, Weatherford merged with Energy Ventures Incorporated ("EVI"), a Delaware company headquartered in Houston. EVMEI – based out of Dubai and incorporated in the Cayman Islands – had been an oil field services subsidiary of EVI and was responsible for EVI's business in the Middle East, which included business interests in Iran. After the merger, EVMEI continued to exist as a subsidiary of Weatherford. In September 2001, a Weatherford employee – formerly an EVI employee – and naturalized U.S. citizen was terminated from Weatherford. That employee previously had handled the winding down of EVI operations in Iran in the wake of President Clinton's 1995 Executive Order strengthening the embargo against Iran. As part of his severance package, ownership of EVMEI was transferred to the employee in October 2001. At that time, EVMEI was a corporate shell that had no continuing contracts or assets in any country. It consisted of a trademark and a corporate form. Subsequent to the severance of this employee and the transfer of the EVMEI corporate form to the employee, the employee became Managing Director of the newly-transferred EVMEI.

54. In January 2002, WOTME entered into a Consultancy Agreement with EVMEI, which included conducting business in Iran. The Consultancy Agreement provided as its scope:

   "The agreement is to include, but not limited to, assistance in continued market surveys within the Islamic Republic of Iran. Advice and recommendations about increasing the local content to gain a competitive advantage. Feasibility studies and/or involvement in local manufacturing of equipment. Periodic audits on our nominated representative in Iran, ensuring Weatherford Completion Systems are receiving the best value from our appointed representative. Assistance in ongoing commission negotiations with our agent, to ensure Weatherford Completions Systems gains the best commercial value from each commission agreement entered into. Combining technical and marketing sharing forums, to help reduce overall costs of such events to Weatherford Completion Systems."

Subsequent to this agreement, EVMEI solicited business in Iran and arranged for WOTME to be a vendor for some of that business. Employees within Weatherford entities had access to documents showing that EVMEI's Managing Director was a naturalized U.S. citizen.

55. The revenue from business in Iran generated by the Managing Director, from 2002 to 2008, amounted to $16,673,974. In 2009 and 2010, no revenue from business in Iran was generated by the Managing Director.

(D)     Acquisition of Iranian Business Interests

56. Weatherford executives and managers located in Houston, Texas, actively participated in acquisitions in 2003 by Weatherford's foreign subsidiary WOTME of oilfield services businesses having substantial operations, assets, and contracts in Iran, including Neyrfor Weir ("Neyrfor") and Drilling Tools (International) Ltd. ("DTI"). These executives, managers, and/or employees knew that the companies being acquired had assets and/or contracts in Iran and took actions related to the transactions, including approving and facilitating the acquisitions.

57. Executives, managers, and/or employees of Weatherford and/or WOTME made the acquisitions in part to eliminate competition in the region and thereby increase market share in, among other countries, Iran. These executives, managers, and/or employees knew they were assisting WOTME in buying assets located in Iran and contracts related to supporting Iran's oil and gas industry. These officials were aware of Iranian sanctions, and in the case of these acquisitions, used code words like "offshore Dubai" to refer to Iran.

        a.     Neyrfor

58. WOTME employees began considering and negotiating the acquisition of Neyrfor, a company incorporated in the United Kingdom, in 2002, and ultimately acquired Neyrfor and its directional drilling operations in 2003.

59. A WOTME executive brought the Neyrfor acquisition opportunity to the attention of Weatherford managers in December 2002, through an email to an executive located in Houston. The email explained that Neyrfor was operating exclusively in Iran and might be a vital acquisition, stating that it had contracts with NIOC, among others, and was bidding on other Iranian oil projects, and that "we could do a lot with Neyrfor in the Middle East" and it would complete our existing package in Iran."

60. Later, a senior WOTME executive endorsed the pending bid by noting that "the directional drilling services will be an added value for the ME&NA and Neyrfor's focus is 'offshore Dubai' which is an area that we are expanding so this fits very well and we are in favor of us moving ahead with this." At the time of the acquisition, Neyrfor's only existing contracts for providing services were in Iran.

61. The actions by Weatherford employees in Houston included:  preparing bid documents; analyzing costs, assets and liabilities; determining and setting bid pricing; engaging Weatherford personnel and third parties to facilitate consummating the transaction;

staffing conference calls to discuss and decide on the purchase; negotiating on behalf of WOTME; seeking (and receiving) advice and direction from management in Houston; providing legal advice before and after the acquisition; and preparing key documents effecting the purchase.

62. WOTME purchased Neyrfor for $4.5 Million in 2003.

      *b.*    *DTI*

63. DTI consisted of two separate entities, one of which was incorporated in Dubai and the other in Gibraltar. DTI was primarily a Fishing and Rental Tools company which operated in a number of countries in the Middle East and North Africa, including Iran.

64. DTI's primary markets included the Northern Emirates, Abu Dhabi, Iran, Yemen, and Saudi Arabia. DTI's services included offering rental tools, fishing tools, well installation services, and repair services. At the time, three individuals owned DTI, all of whom apparently were thought to be U.S. persons, and two of whom were Iranian Americans.

65. Several executives, managers, and/or employees from Weatherford's Houston headquarters were extensively involved in the acquisition of DTI, which conducted business in Iran. At least as early as April 2001, Weatherford had developed an interest in acquiring DTI, and Weatherford managers in its Houston headquarters were aware of the company's Iranian business interests. These U.S. persons encouraged WOTME to negotiate a deal, consult with Houston for approval, and acquire DTI. WOTME and Weatherford Houston personnel understood that DTI conducted business in Iran. Both WOTME and Weatherford Houston managers sought to "get the company out of the market before they completely destroy the rates . . . ." WOTME sought to utilize Houston's experience in acquisitions to develop a purchase strategy.

66. In January 2003, WOTME managers brought to the attention of senior managers in Houston that DTI had "become very aggressive" and was "operationally . . . continuously creating damage to us retaining business and keeping our margins." Executives and/or managers in Houston decided to "dust off the information and . . . see what it would take to get this done."

67. Executives, managers, and/or employees at Weatherford's Houston headquarters became heavily engaged in the acquisition and kept the "dialogue at the highest corporate level [in Houston] to maintain the strictest confidentiality." The actions by Weatherford executives, managers, and/or employees in Houston included: determining and clearing on bid pricing; reviewing and analyzing DTI's audited financials; engaging Weatherford personnel to facilitate the transaction; negotiating the terms on behalf of WOTME and making an offer to DTI; seeking (and receiving) instructions from management; drafting and editing a letter of intent to DTI; and preparing key documents effecting the purchase. In the course of internal Weatherford and WOTME discussions, DTI's Iran business was occasionally referred to as "offshore Dubai."

68. On December 16, 2003, WOTME acquired DTI for a price of $13.5 Million.  The acquisition included contracts or pending tenders for several Iranian customers, including Petroiran Development Company, Edison International, Iran Branch, Schlumberger, and OMV (Iran) Onshore Exploration GmbH.

69. The revenue generated from Neyrfor and DTI's business, from 2003 through 2007, amounted to $10,385,293.  No revenues were generated from Neyrfor or DTI business in Iran in 2009 or 2010.

    (E)    Liner Hanger Transactions

70. In the oilfield services industry, a "liner hanger" is a device used to attach wall liners to cemented large-diameter pipe during oil well construction.  Weatherford's business activities in Iran, Sudan, and Syria involved liner hanger business transactions.  Non-U.S. person employees in WOTME's "Liner Hanger Department" ordered certain products from the United States, including items subject to the EAR, with the specific intention of exporting those products to Iran, Sudan, and Syria.

71. In September 2003, Weatherford created a centralized global procurement and inventory management system that coordinated and managed its liner hanger inventory, known as Global Product Support Services ("GPS").  GPS was initially based in New Iberia, Louisiana, but was transferred in July 2006 to Huntsville, Texas.  GPS was meant to apply to international orders for non-sanctioned countries.

72. Weatherford's liner hanger employees were instructed that all international orders for products destined for non-sanctioned countries would be sent to the Liner Hanger Central Warehouse, located in the United States, and that U.S. citizens and residents could not participate in any transaction involving countries sanctioned by the U.S. Government. The Weatherford employees were referred to Weatherford export compliance and sanction country guidance located on the Weatherford intranet.  Despite this guidance, at least some liner hanger orders that were placed by WOTME were filled using GPS services.

73. WOTME's Liner Hanger Department made efforts to conceal the ultimate destination of U.S.-origin liner hanger parts.  For example, prior to August 2004, the Department ordered Liner Hanger equipment from the United States under a general inventory number for the Middle East.  Then, when these goods arrived in the Middle East, they were re-directed to Iran, Sudan, and Syria.  U.S. personnel believed that these goods were not being sent to any locations prohibited by U.S. sanctions or export controls laws, but instead were being exported to the Middle East to be placed in general inventory for use by WOTME.

74. In mid-2004, WOTME's liner hanger product line team met to create a numbering system for processing liner hanger orders for the Middle East.  The following codes were created:  LIRN denoted orders for Iran; LSYR for Syria; LSUD for Sudan.  The prefix "LMESJA," standing for "Liner Hanger, Middle East, Stock, Jebel Ali," was also created

15

at that meeting. The LMESJA prefix meant that the end destination was Jebel Ali, a well known free trade zone located in Dubai.

75. Around August 2004, non-U.S. persons in the WOTME Liner Hanger Department established use of the LMESJA prefix as a means to procure U.S.-origin liner hanger equipment, as well as engineering and design support, for specific use in Iran, Sudan, and Syria. Equipment ordered under this unique prefix was specifically intended for use in Iran, Sudan, and Syria at the time it was ordered from the United States.

76. The unique prefix concealed the ultimate destination of the items, and offered the additional benefits of allowing the tracking of liner hanger equipment sourced from the United States and ensuring that the items were not accidentally diverted to a contract in a non-sanctioned country. To ensure that these specially designated goods were utilized for their intended purpose in sanctioned countries, WOTME employees created linked files for each order on their local network drive. The linked files tied the orders back to the correct code for the respective sanctioned country (*i.e.*, LIRN, LSYR, and LSUD). This special prefix methodology was only used by WOTME when it was ordering U.S.-origin items for use in Iran, Sudan, and Syria. Additionally, WOTME employees removed U.S. labels on goods and misstated the country of origin. U.S. Government authorization was not obtained for any of these exports to Iran, Sudan, or Syria.

77. WOTME's Liner Hanger Department also used the LMESJA reference for "Requests for New Equipment" ("RNE") to conceal work relating to Iran, Sudan, or Syria, when requisitioning design work from U.S. engineering personnel.

78. WOTME generated the following revenues from liner hanger sales to Iran, Sudan, and Syria: Iran (2002-2008) $19,427,933; Sudan (2003-2008) $3,481,802; and Syria (2004-2006) $1,692,231. No revenues were generated from liner hanger sales to Iran, Sudan, or Syria in 2009 or 2010.

## V.   Cooperation and Remediation

79. After the government commenced its investigation of potential sanctions violations by Weatherford's subsidiaries, Weatherford devoted substantial time, effort, and resources to investigate numerous potential export control and sanctions issues, and to present findings, evidence, and documentation to the Government in response to various Government requests. Weatherford produced over 3.2 million pages of documentary evidence to the U.S. Government and has committed to continuing its cooperation with this Office, the Office of Foreign Assets Control, and the Department of Commerce. In September 2007, Weatherford ordered all of its subsidiaries to discontinue all business operations in Cuba, Iran, Sudan and Syria. The process of unwinding existing business operations was completed by March 31, 2008. By the first quarter of 2012, withdrawal activities to recover bank accounts and equipment from Cuba, Iran, Sudan and Syria pursuant to OFAC-licenses ceased and the withdrawal was complete.